IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| INDEPENDENT COMMUNITY BANKERS<br>OF AMERICA,<br><br>    Plaintiff,<br><br>       v.<br><br>NATIONAL CREDIT UNION<br>ADMINISTRATION,<br><br>    Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)  Case No. 1:16cv1141 (JCC/TCB)<br>)<br>)<br>)<br>)<br>)<br>) |

**M E M O R A N D U M   O P I N I O N**

Plaintiff Independent Community Bankers of America, a trade association that represents community banks, brings suit challenging regulations adopted by Defendant National Credit Union Administration.  Defendant has filed a Motion to Dismiss [Dkt. 18] contending, in relevant part, that Plaintiff's suit is time-barred and that Plaintiff lacks standing.  The Court agrees.  Accordingly, the Court will grant Defendant's Motion and dismiss Plaintiff's Complaint.

### I. Background

Congress passed the Federal Credit Union Act, 12 U.S.C. § 1751, *et seq.*, in the midst of the Great Depression. The Act authorizes the chartering of federal credit unions –

member owned and democratically operated financial cooperatives that provide services similar to those offered by banks. Defendant is an administrative agency charged with overseeing federally chartered credit unions and "administering the [Federal Credit Union Act]." *Nat'l Credit Union Admin. v. First Nat. Bank & Trust Co.*, 522 U.S. 479, 483 (1998). Defendant's authority also extends to state-chartered credit unions that elect to be insured by the National Credit Union Share Insurance Fund. *See Credit Union Nat. Ass'n v. Nat'l Credit Union Admin.*, 57 F. Supp. 2d 294, 296 (E.D. Va. 1995).

This case concerns regulations Defendant adopted pursuant to 12 U.S.C § 1757a(a), a provision of the Act titled "Limitation on member business loans." This portion of the statute provides that "no insured credit union may make any member business loan that would result in a total amount of such loans outstanding at that credit union" to exceed the lesser of "1.75 times the actual net worth of the credit union" or 12.25% of the credit union's assets. *Id.* The term "member business loan" is defined as "any loan, line of credit, or letter of credit, the proceeds of which will be used for a commercial, corporate, or other business investment or venture, or agricultural purpose." *Id.* § 1757a(c)(1)(A). At issue here is whether and to what extent this limitation applies to interests

in loans made to persons *not* members of a given credit union that are acquired, but not originated, by that credit union.[1]

In 1999, Defendant issued its first rule interpreting and implementing these provisions of the Act. *See* 64 Fed. Reg. 28,721 (May 27, 1999). The 1999 Rule provided that "[u]nless otherwise exempt," interests in loans acquired but not originated by a credit union "are to be counted against the aggregate loan limit for the participating credit union." *Id*. at 28,725. The Rule did not distinguish between interests in loans made to members and loans made to nonmembers.

In 2003, Defendant issued a notice of proposed rulemaking stating that it had "reconsidered its position regarding the treatment of loan participations by purchasing credit unions and propose[d] to exclude participation interests from the calculation of the aggregate [member business loan] limit." 68 Fed. Reg. 16,450, 16,451 (Apr. 4, 2003). The agency ultimately stopped short of excluding all loan interests acquired, but not originated, by a credit union from the statutory cap. Finding the statute's language "lends itself to several possible interpretations," Defendant adopted a rule distinguishing between interests in loans made to credit union members and interests in loans made to nonmembers. 68 Fed. Reg.

---

[1] Credit unions are authorized to purchase interests in loans made by other lenders, or "participation interests," pursuant to 12 U.S.C. § 1757(5)(E) and 12 C.F.R. § 701.22.

56,537, 56,539, 56,543 (Oct. 1, 2003).  While interests in loans made to members remained subject to the "Limitation on member business loans" cap, the agency found that "purchases of nonmember loans and participation interests . . . do not involve the provision of member loan services, and the acquired loan assets are not [member business loans]."  *Id.* at 56,544.

The agency recognized that nonmember loans are "business loan asset[s] with all of the attendant risks," and noted that if abused, the new rule might provide a "loophole" for credit unions.  *Id.* at 56,544.  Accordingly, Defendant required credit unions to seek approval from the agency's Regional Director before purchasing an interest in a nonmember business loan when, combined with the credit union's member business loans, doing so would cause the credit union to exceed the statutory cap.  *See id.*

Defendant undertook its most recent rulemaking in 2015.  The agency primarily proposed to change the manner in which it regulates member business loans, moving away from "prescriptive underwriting criteria and waiver requirements in favor of a principles-based approach to regulating commercial loans."  80 Fed. Reg. 37,898, 37,899 (July 1, 2015).  As part of that process, the agency proposed to eliminate the requirement that credit unions seek approval before purchasing interests in nonmember loans when doing so would cause them to exceed the

4

statutory cap.  *Id*. at 37,909-10.  Instead, the purchase of such interests would be subject to the same overarching principles applicable to other commercial loans under the new regulations. *See id*.  The notice of proposed rulemaking "emphasize[d] that a credit union's non-member commercial loans or participation interests in non-member commercial loans made by another lender continue to be excluded from the [member business loan] definition and are not counted . . . in calculating the statutory aggregate amount."  *Id*.

In March of 2016, Defendant issued a final rule adopting its earlier proposal.  81 Fed. Reg. 13,530 (Mar. 14, 2016).  The agency responded to public comments criticizing its approach to loan participations, "emphasiz[ing] that [it]s current approach with respect to [member business] loan participations has been unchanged since 2003," and stating that, "[a]fter careful consideration of the public comments on this issue, the Board continues to subscribe to the views articulated in 2003 and has determined to adopt the proposed approach without change."  81 Fed. Reg. at 13,548-49.  Accordingly, for purposes of the present suit, the only relevant change wrought by the 2016 Rule was the elimination of the permission-to-purchase requirement.  *See id*. at 13,549.  The relevant portions of the 2016 Rule took effect on January 1, 2017.

On September 7, 2016, Plaintiff filed the instant challenge to the 2016 Rule under the APA.  Plaintiff contends that Defendant acted unlawfully in interpreting 12 U.S.C § 1757a to exclude interests in nonmember business loans acquired by credit unions from the statutory cap on member business loans. *See* Compl. [Dkt. 1] ¶ 90.  On November 2, 2016, Defendant filed the instant Motion to Dismiss [Dkt. 18] pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

## II. Legal Standard

A motion filed pursuant to Rule 12(b)(1) challenges the Court's subject matter jurisdiction over the pending action. The burden of proving subject matter jurisdiction falls on the plaintiff. *McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 189 (1936); *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982).  Where, as here, "a Rule 12(b)(1) motion challenge is raised to the factual basis for subject matter jurisdiction . . . the district court is to regard the pleadings' allegations as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment."  *Richmond, Fredericksburg & Potomac R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991).

"The purpose of a Rule 12(b)(6) motion is to test the sufficiency of a complaint; importantly, [a Rule 12(b)(6) motion] does not resolve contests surrounding the facts, the

6

merits of a claim, or the applicability of defenses." *Edwards v. City of Goldsboro*, 178 F.3d 231, 243-44 (4th Cir. 1999) (citation omitted).  While the Court must accept well-pled allegations of fact as true when ruling on a Rule 12(b)(6) motion, the Court need not accept legal conclusions disguised as factual allegations.  *Ashcroft v. Iqbal*, 556 U.S. 662, 679-81 (2009).  Moreover, "[l]aws – including statutes and formal rules and regulations – are subject to judicial notice because they are matters of public record and common knowledge."  *Ebersole v. Kline-Perry*, No. 1:12-cv-26, 2012 WL 2673150, at *3 (E.D. Va. July 5, 2012).

### III. Analysis

#### A. Timeliness

The Court begins its analysis with Plaintiff's Complaint.  Curiously, the Complaint makes little mention of the regulatory changes wrought by the 2016 Rule.  Indeed, Plaintiff dedicates only seven of the Complaint's 90 paragraphs to the Rule Plaintiff ostensibly challenges.  Instead, Plaintiff's Complaint is almost entirely addressed to Defendant's *2003* Rule. The relief Plaintiff requests is directed solely at overturning changes in Defendant's regulations traceable to the 2003 Rule, to wit, the agency's determination that "purchases of nonmember loans and participation interests . . . do not involve the provision of member loan services, and the acquired loan assets

7

are not [member business loans]."  68 Fed. Reg. at 56,544; *see also* Compl. [Dkt. 1] ¶ 90.[2]  Plaintiff does not attack the elimination of the permission-to-purchase requirement in and of itself.

This is significant because a six-year statute of limitations applies to lawsuits brought under the APA.  *See* 28 U.S.C. § 2401(a); *Jersey Heights Neighborhood Ass'n v. Glendening*, 174 F.3d 180, 186 (4th Cir. 1999).  Any challenge to the 2003 Rule should therefore have been filed – at the latest – by October 1, 2009, six years after Defendant published its 2003 Rule.  Plaintiff's suit would, under normal circumstances, be time-barred to the extent it challenges Defendant's 2003 Rule.

---

[2]      In relevant part, Plaintiff seeks "(1) a declaratory judgment that NCUA acted contrary to law and arbitrarily and capriciously in violation of the FCU Act and the Administrative Procedure Act by adopting a rule that purports to exclude certain commercial loans and interests in commercial loans purchased by credit unions from the aggregate limit on 'member business loans' imposed in 12 U.S.C. § 1757a; (2) a declaratory judgment that NCUA acted contrary to law and arbitrarily and capriciously in violation of the FCU Act and the Administrative Procedure Act by adopting a rule that purports to treat a credit union's purchase of a commercial loan or interest in a commercial loan from another lender as anything other than the 'mak[ing]' of a 'member business loan' within the meaning of 12 U.S.C. § 1757a; (3) an order invalidating and setting aside NCUA's 2016 MBL Rule and related adopting release to the extent they purport to treat acquired commercial loans and interests in such loans that are not subject to a statutory exception as anything other than a 'member business loan' for purposes of the lending restriction of 12 U.S.C. § 1757a."  Compl. [Dkt. 1] ¶ 10.

*See Jersey Heights Neighborhood Ass'n*, 174 F.3d at 186; *Hire Order Ltd. v. Marianos*, 698 F.3d 168, 170 (4th Cir. 2012).

Plaintiff appears to concede in its Opposition that its challenge is directed to the 2003 Rule. *See* Opp. [Dkt. 25] at 12-13. Plaintiff contends, however, that it may challenge the 2003 Rule under the "reopening" doctrine. That doctrine holds that when an agency reconsiders a settled rule, aggrieved parties may contest the agency's decision not to change the rule. *See Kennecott Utah Copper Corp. v. Dep't of Interior*, 88 F.3d 1191, 1214 (D.C. Cir. 1996).

The Court can find no Supreme Court or Fourth Circuit precedent recognizing the reopening doctrine. As such, the doctrine's status in this Circuit is unsettled. Assuming that the Court should recognize the doctrine, however, there is little indication that it applies here.

"The reopening doctrine allows an otherwise stale challenge to proceed because 'the agency opened the issue up anew,' and then 'reexamined . . . and reaffirmed its [prior] decision.'" *P & V Enterprises v. U.S. Army Corps of Engineers*, 516 F.3d 1021, 1023 (D.C. Cir. 2008) (quoting *Pub. Citizen v. Nuclear Reg. Comm'n*, 901 F.2d 147, 150-51 (D.C. Cir. 1990)) (alterations in original). "An explicit invitation to comment on a previously settled matter, even when not accompanied by a specific modification proposal, is usually sufficient to affect

9

a reopening." *Nat'l Ass'n of Reversionary Prop. Owners v. Surface Transp. Bd.*, 158 F.3d 135, 142 (D.C. Cir. 1998). "The doctrine only applies . . . where 'the entire context' demonstrates that the agency 'ha[s] undertaken a serious, substantive reconsideration of the [existing] rule." *P & V Enterprises*, 516 F.3d at 1024 (citations omitted).

In support of its contention that Defendant reopened the issues settled by its 2003 Rule, Plaintiff relies primarily on two isolated sentences – one from the 2015 Notice of Proposed Rulemaking, and one from the final 2016 Rule.[3] As to the former, Plaintiff points to the Notice's general invitation to comment, which states that "commenters should not feel constrained to limit their comments to the issues discussed above" but "are encouraged to discuss any other relevant [member business loan] issues they believe [Defendant] should consider that are consistent with and permissible under the existing statute." 80 Fed. Reg. at 37,912. Plaintiff claims that this reflects Defendant's intent to reconsider every regulation it has adopted regarding member business loans, affecting a "regulatory reset"

---

[3]  The Court notes that Plaintiff dedicates less than a paragraph of its Opposition to explaining what, specifically, Defendant did to reopen its 2003 Rule. *See* Opp. [Dkt. 25] at 13. This effort is, on its face, insufficient to account for the "entire context," *P & V Enterprises*, 516 F.3d at 1024, of the 2016 Rule.

that sweeps in all aspects of the 2003 Rule.  Opp. [Dkt. 25] at 13.

This is a slim reed.  By "encourag[ing] [commenters] to discuss . . . relevant [member business loan] issues they believe [Defendant] *should* consider," 80 Fed. Reg. at 37,912 (emphasis added), Defendant did not suggest that it *would* undertake "serious, substantive reconsideration," *P & V Enterprises*, 516 F.3d at 1024, of every regulation it had previously adopted.  Merely welcoming general comments beyond the scope of a proposed rulemaking does not affect a "regulatory reset."   "When an agency invites debate on some aspects of a broad subject . . . it does not automatically reopen all related aspects including those already decided." *Nat'l Ass'n of Reversionary Prop. Owners*, 158 F.3d at 142.

Moreover, while the 2015 Notice of Proposed Rulemaking proposed broad changes to the agency's regulations, it also suggested that the agency was specifically unwilling to reconsider the aspects of the 2003 Rule Plaintiff challenges. Defendant took pains to "emphasize that a credit union's non-member commercial loans or participation interests in non-member commercial loans made by another lender continue to be excluded from the [member business loan] definition and are not counted . . . in calculating the statutory aggregate amount."  80 Fed. Reg. at 37,909-10.  This appears to be a disavowal of any intent

11

to reopen the 2003 Rule, notwithstanding Defendant's invitation for comment on member business loans generally.

Plaintiff next directs the Court's attention to the portion of the 2016 Rule in which the agency states that, "[a]fter careful consideration of the public comments on this issue, the Board continues to subscribe to the views articulated in 2003 and has determined to adopt the proposed approach without change."  81 Fed. Reg. at 13,548-49.  This, Plaintiff argues, demonstrates that Defendant did in fact reconsider its earlier Rule.

The fact that the agency "careful[ly] consider[ed] public comments" on a topic, however, does not affect a reopening.  Where, as here, an agency merely "acknowledge[s] receipt of . . . comment[s]" and "reaffirms its contrary position," that does not subject its settled regulations to renewed challenge.  *Kennecott Utah Copper Corp. v. U.S. Dep't of Interior*, 88 F.3d 1191, 1213 (D.C. Cir. 1996); *see also Biggerstaff v. FCC*, 511 F.3d 178, 186 (D.C. Cir. 2007) ("[A]n agency [does not] reopen an issue by responding to a comment that addresses a settled aspect of some matter, even if the agency had solicited comments on unsettled aspects of the same matter.").  To hold otherwise would transform the reopening doctrine into "a license for bootstrap procedures by which petitioners can comment on matters other than those actually at

issue, goad an agency into a reply, and then sue on the grounds that the agency had re-opened the issue." *Am. Iron & Steel Inst. v. U.S. E.P.A.*, 886 F.2d 390, 398 (D.C. Cir. 1989).

At oral argument, Plaintiff further called the Court's attention to new regulations from the 2016 rulemaking that reference relevant aspects of Defendant's 2003 Rule. Defendant's regulations now define "member business loan" to exclude "[a]ny non-member commercial loan or non-member participation interest in a commercial loan made by another lender[.]"  12 C.F.R. § 723.8(b)(2).  Defendant similarly adopted a new regulation defining "commercial loan" to include "any loan, line of credit, or letter of credit . . . and any interest a credit union obtains in such loans made by another lender . . . for commercial, industrial, agricultural, or professional purposes, but not for personal expenditure purposes."  *Id*. § 723.2.  Plaintiff takes the position that because these new regulations mention the 2003 Rule, that Rule has been "reopened."

Plaintiff cites no authority to support this proposition, and the Court finds the argument unpersuasive.  The reopening doctrine applies where the context of a rulemaking indicates an agency reconsidered the substance of an earlier rule.  *See P & V Enterprises*, 516 F.3d at 1024.  Plaintiff directs the Court's attention to changes in Defendant's

13

regulations that serve only to reiterate and entrench the agency's 2003 determination that "purchases of nonmember loans and participation interests . . . do not involve the provision of member loan services, and the acquired loan assets are not [member business loans]."  68 Fed. Reg. at 56,544.  Merely codifying an extant rule in part of a new regulation does not effectuate a reopening.  If anything, this reflects the agency's view that its earlier rule is a settled to the point that it may serve as a foundation for further rulemaking.

     The Court notes further that the above does not account for "the entire context" of the 2016 Rule.  *P & V Enterprises*, 516 F.3d at 1024.  A survey of that context indicates that Defendant did not undertake a "serious, substantive reconsideration," *id.*, of the 2003 Rule.  The changes proposed in the 2016 Rule presupposed the retention of the 2003 Rule.  Indeed, Plaintiff's pleadings present the 2016 Rule as the continuation of an unbroken trend toward liberalizing regulations regarding credit union participation in commercial loans beginning with, and building upon, the 2003 Rule.  *See* Compl. [Dkt. 1] ¶¶ 43-60.  Similarly, Plaintiff goes to great lengths to paint Defendant as a "cheerleader" for credit union participation in commercial loans, *id.* ¶ 79, then inconsistently asserts that Defendant "serious[ly], substantive[ly]," *P & V Enterprises*, 516 F.3d at 1024,

reconsidered its decision to permit credit unions to do so more broadly.  Moreover, as discussed above, the agency's 2015 Notice of Proposed Rulemaking "emphasiz[ed]" its continued adherence to the 2003 Rule, 80 Fed. Reg. at 37,909-10, and the final 2016 Rule likewise "emphasiz[ed]" that the agency's views on the topic "ha[ve] been unchanged since 2003."  81 Fed. Reg. at 13,548.

In short, the reopening doctrine would not apply in this instance even were the Court to recognize it.  Accordingly, Plaintiff's Complaint is time-barred to the extent it challenges the substance of Defendant's 2003 Rule.

Having reached this conclusion, it is not clear what remains of Plaintiff's suit.  Plaintiff's Complaint makes relatively little mention of the 2016 Rule; as noted earlier, the relief Plaintiff requests is addressed entirely to the 2003 Rule.  *See* Compl. [Dkt. 1] ¶ 90.  Plaintiff does not argue that Defendant committed an independent violation of the APA by abandoning the permission-to-purchase requirement in the 2016 Rule.  Rather, it is Plaintiff's position that the permission-to-purchase requirement had no basis in the Federal Credit Union Act from the start.  *See id*. ¶¶ 51-53; Opp. [Dkt. 25] at 5 (arguing that "the FCU Act does not permit such waivers").  Stripped of its references to the 2003 Rule, Plaintiff's argument regarding the 2016 Rule is reduced to the claim that,

15

as a matter of policy, Defendant's previous unlawful Rule was better than its new unlawful Rule.  This does not state a claim for relief under the APA.  The discussion above therefore appears to dispose of this matter entirely.

Assuming, however, that some residuum of Plaintiff's challenge to the 2016 Rule remains, the Court finds that Plaintiff lacks standing to bring it.

## B. Standing

To establish standing, Article III generally requires that a plaintiff demonstrate "it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000).  Plaintiff relies on the doctrine of "associational standing," which applies only if one or more of Plaintiff's members can establish standing on an individual basis. *See Retail Indus. Leaders Ass'n v. Fielder*, 475 F.3d 180, 186 (4th Cir. 2007).  In order to demonstrate the injury component of standing, Plaintiff must therefore show that harm to its members is certainly impending, as opposed to merely possible, under Defendant's 2016 Rule. *See Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1147 (2013).  Plaintiff bears a particularly heavy burden in making this showing, as neither it,

nor its members, is subject to the challenged regulation.  *See*
*Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992).

Plaintiff claims that its members can demonstrate the
injury component of standing because "economic actors 'suffer an
injury in fact when agencies lift regulatory restrictions on
their competitors or otherwise allow increased competition'
against them."  *Sherley v. Sebelius*, 610 F.3d 69, 72 (D.C. Cir.
2010) (quoting *La. Energy & Power Auth. v. FERC*, 141 F.3d 364,
367 (D.C. Cir. 1998)).  Even under the doctrine of "competitor
standing," however, "[i]t remains indispensable . . . that the
increase in competition and the corresponding injury are
'imminent' and not merely 'speculative.'"  *Delta Air Lines, Inc.*
*v. Exp.-Imp. Bank of United States*, 85 F. Supp. 3d 250, 262
(D.D.C. 2015); *see also El Paso Nat. Gas Co. v. F.E.R.C.*, 50
F.3d 23, 27 (D.C. Cir. 1995) ("The nub of the 'competitive
standing' doctrine is that when a challenged agency action
authorizes allegedly illegal transactions that will *almost*
*surely* cause petitioner to lose business, there is no need to
wait for injury from specific transactions to claim standing.")
(emphasis added).  The doctrine does not apply when agency
action constitutes at most "the first step in the direction of
future competition."  *New World Radio, Inc. v. F.C.C.*, 294 F.3d
164, 172 (D.C. Cir. 2002).

It is not clear at this point that Defendant's 2016 regulation will result in increased competition against Plaintiff's member banks.  Credit unions were able to compete with banks in the commercial loan arena before the 2016 Rule.  Indeed, Plaintiff represents that they have done so vigorously. *See, e.g.*, Opp. [Dkt. 25] at 5-7.  The 2016 Rule on its face does not permit additional competition.  All it does is dispense with the requirement that, after taking on a certain amount of member business loans, a credit union obtain permission to purchase an additional interest in a nonmember business loan.

Plaintiff does not contend that Defendant frequently denied such permission prior to adopting the 2016 Rule.  Indeed, at the hearing on this matter, Plaintiff's counsel would not so much as hazard a guess as to how often Defendant denied permission under the old Rule.  In the absence of direct evidence, Plaintiff might have presented circumstantial evidence suggesting that the permission-to-purchase requirement has served as a meaningful barrier to credit union participation in nonmember business loans.  Plaintiff, however, argues at length in its various filings that the opposite is true.  Plaintiff claims that Defendant has acted as a "cheerleader" for credit union participation in commercial loans, Compl. [Dkt. 1] ¶ 79, and contends that the adoption of the 2003 Rule occasioned an "increase in commercial lending by credit unions . . .

18

correspond[ing] to [Defendant]'s unlawfully lax enforcement of
the statutory cap on credit union commercial lending."  Opp.
[Dkt. 25] at 5; *see also* Cole Decl. [Dkt. 25-1] ¶ 12 (claiming
that Defendant has been "historically lax" in "enforc[ing] . . .
the statutory [member business loan] cap").  In short, there is
no evidence now before the Court to suggest that Defendant
regularly – or indeed ever – denied permission under the
previous requirement.  It is therefore unclear that the removal
of this requirement will cause Plaintiff's members to face
increased competition.

Furthermore, the evidence before the Court suggests
that credit unions have only infrequently been required to ask
Defendant's permission to acquire an interest in nonmember
business loans.  The final 2016 Rule states that Defendant
"processed 336 and 225 [member business loan] related waiver
requests, in 2014 and 2015 respectively."  81 Fed. Reg. at
13,552.  In the context of the national financial system, these
numbers are quite small.  Plaintiff, for example, boasts "nearly
6,000" member banks "operat[ing] 24,000 locations worldwide
. . . hold[ing] $1.4 trillion in assets, $1.2 trillion in
deposits, and $950 billion in loans to consumers, small
businesses, and farmers."  Compl. [Dkt. 1] ¶¶ 11, 13.  A study
hosted on Plaintiff's website finds that "the vast majority of
credit unions are nowhere near their credit limit: Only 1.6

percent of credit unions are at or above the 12.5 percent cap, and over 70 percent of credit unions have no member business loans at all[.]"  Ike Brannon, *An Analysis of the Impact of Expanding the Ability of Credit Unions to Increase Commercial Loans*, at 2 (Nov. 2012), http://tinyurl.com/j5l6f7e.  While Plaintiff claims that "hundreds of credit unions are 'bumping up against' the statutory cap and clamoring for additional relief," Opp. [Dkt. 25] at 6, the source it cites states only that, nationwide, "148 credit unions . . . had business loans of more than 10% of assets" and were "essentially capped or will reach the cap in the next twelve months."  *See* Opp. Exh. E [Dkt. 25-6] at 6.  It therefore appears that the permission-to-purchase requirement has in recent years been relevant only to a relatively small number of transactions.  For this reason as well it is not clear that the removal of this requirement "will *almost surely* cause [Plaintiff's members] to lose business."  *El Paso Nat. Gas Co.*, 50 F.3d at 27 (emphasis added).[4]

---

[4]      At oral argument, Plaintiff's counsel conceded that it is unknown whether there will be an appreciable increase in competition against Plaintiff's member banks, and that not every loan a credit union makes is necessarily a lost opportunity for Plaintiff's member banks.  Plaintiff's counsel nonetheless contended that Plaintiff can still demonstrate associational standing because "any increase in competition as a result of the rule," no matter how small, "would be a basis for standing."  This overstates the competitor standing doctrine.  The doctrine applies where "a challenged agency action authorizes allegedly illegal transactions that will *almost surely* cause [the plaintiff] to lose business[.]"  *El Paso Nat. Gas Co.*, 50 F.3d

Finally, apart from Defendant's regulations, the member business loan cap is subject to numerous statutory exceptions that permit credit unions to compete with banks in commercial loans.  For example, credit unions that are "chartered for the purpose of making, or that ha[ve] a history of primarily making, member business loans," or that "serve[ ] predominantly low-income members" are not subject to the member business loan cap.  12 U.S.C. § 1757a(b).  The term "member business loan" is likewise defined to exclude certain categories of loans, such as loans "made to a borrower or an associated member that has a total of all such extensions of credit in an amount equal to less than $50,000," and loans that are "fully insured or fully guaranteed by . . . any agency of the Federal Government or of a State."  *Id*. § 1757a(c)(1)(B).  For this reason as well, it is does not appear that the permission-to-purchase has served as a meaningful barrier to credit union participation in commercial loans.

Defendant counters that "an increase in commercial lending by credit unions and credit union participation syndicates is the direct, logical, and intended result of" the elimination of the permission-to-purchase requirement.  Opp.

---

at 27 (emphasis added).  Based on counsel's representations, an incremental increase in nonmember commercial loan participation by credit unions would not "almost surely" cause Plaintiff's members to lose business.

21

[Dkt. 25] at 14.  That is not so.  The requirement was never intended to curtail commercial lending by credit unions. Rather, it was instituted to safeguard the soundness of the credit union system.  *See* 81 Fed. Reg. at 13,549.  The new regulations replace the permission-to-purchase requirement with a principles-based approach, requiring credit unions to perform the same sort of safety evaluation previously performed by the agency before participating in nonmember business loans.  *See id.* at 13,557.  The rule is intended to provide credit unions with greater "flexibility and individual autonomy" in providing services they already perform, *id.* at 13,530, not to increase credit union participation in commercial lending. Moreover, the 2016 Rule cautions that use of this autonomy to "circumvent the statutory aggregate limit will not be tolerated," and that credit unions who do so will be subject to "commensurate supervisory action."  *Id.* at 13,549.  Defendant's argument therefore rests upon the assumption that credit unions will do precisely what the 2016 Rule forbids them to do.  This is, again, mere speculation.

Plaintiff further submits affidavits attesting to the competition its members presently face from credit unions.  *See* Opp. Exhs. 10-12 [Dkts 10, 11, 12].  This anecdotal data "attempt[s] to answer the wrong question."  *Delta Air Lines, Inc.*, 85 F. Supp. 3d at 265.  The competition discussed in

Plaintiff's affidavits is not traceable to the 2016 Rule, and tends only to reinforce the Court's conclusion that the permission-to-purchase requirement did not meaningfully curtail credit union competition with banks – which, again, was not the object of that regulation.  The affidavits therefore do not show that removing that requirement will lead Plaintiff's members to face increased competition and "almost surely cause [them] to lose business."  *El Paso Nat. Gas Co.*, 50 F.3d at 27.

Plaintiff next claims that "the announcement of . . . the 2016 MBL Rule and the expectation in the markets that the exclusion is about to go into effect have an actual, current adverse effect on the franchise value of community banks and therefore on their ability to attract investors and to obtain additional capital on reasonable terms."  Opp. [Dkt. 25] at 15.  Plaintiff, however, provides no support for this bald assertion.  Given the relatively small market share of credit unions, *see* Opp. Exh. F [Dkt. 25-7] at 6 (noting that "[b]anks control about 94% of the assets and credit unions about 6.5%"), and the relatively minor changes in the 2016 Rule to the regulation of nonmember business loan participations, the Court is unwilling to accept this conclusory statement without more.  The burden is on Plaintiff to demonstrate standing, *see Lujan*, 504 U.S. at 561, and Plaintiff cannot meet that burden with its mere say-so alone.  Moreover, even assuming that some of Plaintiff's members

have recently encountered difficulties in attracting investors,
Plaintiff has put forth no evidence to demonstrate that those
difficulties are attributable to the 2016 Rule.  The Court is
therefore unable to say that any such difficulties are fairly
traceable to Defendant and not to market forces caused by some
"third party not before the court."  *Id.* at 560.

In light of the foregoing, the Court must conclude
that, to the extent Plaintiff's challenge is not time-barred,
Plaintiff lacks standing to maintain this action.  Accordingly,
that Court will grant Defendant's Motion and dismiss Plaintiff's
Complaint.  The Court will further deny Plaintiff's Conditional
Motion for Scheduling Order [Dkt. 44] as moot.[5]

The Court notes, however, that even had Plaintiff
established its standing and the timeliness of its suit, the
Court would still find that the challenged regulations pass
muster under the APA and *Chevron*.

### C. Plaintiff's APA Claim

The two-step inquiry of *Chevron, U.S.A., Inc. v.
Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43

---

[5]      Plaintiff argues further that to dismiss this case
before receiving the full administrative record would be
premature.  Plaintiff, however, fails to explain what in the
administrative record might be relevant to the Court's analysis.
The arguments before the Court are, for the most part, purely
legal.  The Court can think of no reason why a review of the
administrative record is necessary in light of the foregoing
analysis.

(1984), asks first whether Congress has "directly spoken to the precise question at issue."  Plaintiff contends that it has, and that the term "member business loan" unambiguously refers to loans made both to members of a given credit union and *non*members alike.  In support of this proposition, Plaintiff points out that credit unions may only acquire interests in loans where "[t]he borrower becomes a member of one of the participating credit unions before the purchasing federally insured credit union purchases a participation interest in the loan."  12 CFR § 701.22(b)(4); *see also* 12 U.S.C. § 1757(5).  Because the recipient of any loan in which a credit union participates will therefore ultimately be a member of *some* credit union, Plaintiff argues that the term "member business loan" encompasses all possible loan purchases and participations by a credit union, including those where the borrower is not a member of that *specific* credit union.  Defendant thus acted unlawfully in exempting participation interests in and purchases of nonmember business loans from the statutory cap on "member business loans."

        This is at best a plausible, if creative, construction of the statute.  As Defendant points out, the relevant portions of the Federal Credit Union Act appear to use the terms "membership" and "member" to refer to membership in a *specific* credit union, not membership in a credit union generally.  *See*

12 U.S.C. §§ 1757a, 1759.  Moreover, Plaintiff's interpretation of the statute contravenes an established canon of statutory construction by rendering the word "member" mere surplusage. *See In re Total Realty Mgmt.*, LLC, 706 F.3d 245, 251 (4th Cir. 2013).  If all business loans made by credit unions are "member" business loans, including that qualifier in the statute would serve no purpose.  The use of that term is not merely an oversight, but appears throughout the statute's legislative history.  *See, e.g.*, S. Rep. No. 105-193 (1998), at *10.  This legislative history repeatedly uses the term "member" to refer to membership in a specific credit union.  *See, e.g.*, *id.* ("There are exceptions from the limit on member business loans for insured credit unions that are chartered for the purpose of, or that have a history of primarily making member business loans to members[.]").  In light of the above, Plaintiff has not demonstrated that Congress has "directly spoken to the precise question at issue." *Chevron*, 467 U.S. at 842-43.

        Having established that the statute is ambiguous, the Court next asks whether the challenged regulations are "based on a permissible construction of the statute."  *Chevron*, 467 U.S. at 843.  This is a forgiving standard.  An agency need not have adopted "the best interpretation of the statute," *Atl. Mut. Ins. Co. v. C.I.R.*, 523 U.S. 382, 389 (1998), or the "most natural reading," *Pauley v. BethEnergy Mines, Inc.*, 501 U.S. 680, 702

26

(1991), but need only have adopted an interpretation that is not "flatly contradicted" by the law's plain text. *Dep't of Treasury, I.R.S. v. Fed. Labor Relations Auth.*, 494 U.S. 922, 928 (1990).

Defendant's determination that "purchases of nonmember loans and participation interests . . . do not involve the provision of member loan services, and the acquired loan assets are not [member business loans]," 68 Fed. Reg. at 56,544, easily meets that standard. As discussed above, the statute refers throughout to "member business loans," and generally uses the term "member" to refer to membership in a specific credit union. *See* 12 U.S.C. §§ 1757a, 1759. It is therefore a natural – or at the very least permissible – construction of the statute to interpret the term "member business loan" to mean a business loan made by a credit union to one or more of its members. Although the term "member business loan," as defined in the statute, does not expressly differentiate between members and nonmembers, *see id.* § 1757a(c)(1)(A), "[i]n settling on a fair reading of a statute, it is not unusual to consider the ordinary meaning of a defined term, particularly when there is dissonance between that ordinary meaning and the reach of the definition." *Bond v. United States*, 134 S. Ct. 2077, 2091 (2014). Here, the ordinary meaning of the term "member business loan" supplies the

distinction not expressly stated in the term's statutory definition.[6]

In short, the challenged regulations reflect a reasonable interpretation of the Federal Credit Union Act. Even if the Court was to reach the merits of Plaintiff's APA claims, the Court would still dismiss this case.

### IV. Motions to Participate as Amici Curaie

Also pending before the Court are (1) the Motion for Leave to File Brief as *Amici Curiae* [Dkt. 33] filed by the Credit Union National Association and National Association of Federal Credit Unions; (2) the Motion for Leave to File Brief as *Amicus Curiae* Supporting Plaintiff [Dkt. 42] filed by the American Bankers Association; and (3) the Motion for Leave to File as *Amicus Curiae* Supporting Plaintiff [Dkt. 49] filed by the Executive Council of State Community Bankers Associations. The latter two Motions seek leave to file *amicus* briefs during the summary judgment stage of these proceedings. The former Motion is accompanied by a brief largely addressed to the merits of Plaintiff's case – grounds not necessary to the Court's disposition of Defendant's Motion to Dismiss. In light of the

---

[6] Plaintiff suggests that this principle applies only to criminal statutes. The Court, however, is unable to discern any such limitation in text of the opinions cited. *See Bond*, 134 S. Ct. at 2091; *Johnson v. United States*, 559 U.S. 133, 139–40 (2010). Plaintiff does not direct the Court's attention to any passage indicating that this principle is so limited.

foregoing, the Court finds that the various Motions to participate as *amici curiae* are moot.  Accordingly, they will be denied.

### V. Conclusion

For the foregoing reasons, the Court will grant Defendant's Motion [Dkt. 18] and dismiss Plaintiff's Complaint. The Court will further deny Plaintiff's Conditional Motion for Scheduling Order [Dkt. 44] and the various Motions to participate as *amici curiae* [Dkts. 33, 42, 49].  An appropriate order will issue.

|                        | /s/                                     |
| ---------------------- | --------------------------------------- |
| January 24, 2017       | James C. Cacheris                       |
| Alexandria, Virginia   | UNITED STATES DISTRICT COURT JUDGE      |